UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOSEPH E. BRAUN,

Plaintiff,

Case No. 20-cv-1238-pp

v.

MILWAUKEE COUNTY,

Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 20) AND DISMISSING CASE**

---

The plaintiff brought this case against his former employer, alleging violations of the Family and Medical Leave Act (FMLA), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA). Dkt. No. 12. On April 29, 2022, the defendant moved for summary judgment on all claims. Dkt. No. 20. The court will grant the defendant's motion and dismiss the case.

## I. Facts

The following facts are undisputed unless otherwise noted.

### A. Background Facts

The defendant employed the plaintiff as a nurse in the Behavioral Health Division (BHD) of the Milwaukee County Department of Health and Human Services from 2004 until April 23, 2020. Dkt. No. 26 at ¶1. The BHD provides inpatient hospital services through four licensed psychiatric hospital units with

three specialized programs for adults (43A, 43B and 43C) and one specialized unit for children and adolescents (CAIS), as well as an emergency room and an observation unit associated with the emergency room. Id. at ¶3. Nurses are assigned to a primary unit, but at times may be asked to rotate to the other units of the hospital. Id. at ¶5. The plaintiff primarily worked on the 43A unit at the psychiatric hospital. Id. at ¶4. His supervisor was Steve Ellison, the Nurse Manager for 43A. Id. at ¶¶7–9. For the purposes of summary judgment, the defendant concedes that the plaintiff is a Caucasian male over the age of forty with a medical condition that qualifies under the ADA as a disability. Id. at ¶10.

B. Plaintiff's FMLA Leave

On March 28, 2017, the plaintiff applied for intermittent FMLA leave for a foot condition. Id. at ¶11–12. The defendant's FMLA administrator, FMLA Source, approved the plaintiff's application for intermittent FMLA leave from April 4, 2017 until March 26, 2018. Id. at ¶13. FMLA Source also approved the plaintiff's subsequent requests to extend his leave until March 26, 2020. Id. at ¶¶15–16, 18–19. The plaintiff took twenty-four hours of intermittent FMLA leave in 2017, twenty-four hours in 2018 and sixty-four hours in 2019. Id. at ¶¶14, 17, 20.

The defendant asserts that an employee who experiences a flare-up of an FMLA-covered medical condition is allowed to leave work immediately and is not required to stay and find coverage for his shift. Id. at ¶25. The plaintiff disputes this, describing his attempts to leave mid-shift for flare-ups and asserting that these attempts were thwarted by managers who kept him on

shift for an additional ninety minutes. Id. The plaintiff asserts that Ellison threatened to reprimand him for attempting to leave mid-shift. Id. The plaintiff also alleges that another supervisor, Dana Taft, informed him that he needed to find a replacement if he was going to leave mid-shift due to a flare-up. Id.

In 2017 or 2018, Taft told the plaintiff to work an extra shift, but the plaintiff told Taft that he did not think he would be able to work the shift because he was in too much pain. Id. at ¶27. The plaintiff informed Taft that he was on approved intermittent FMLA leave and Taft allowed him to leave about one hour later. Id. at ¶28. The parties dispute what happened next. The plaintiff asserts that his physician, Dr. Radke, called Ellison to explain that the plaintiff's condition prevented the defendant from requiring him to work over a certain number of hours. Id. at ¶30. The defendant contends that Dr. Radke never informed it that the plaintiff could not work over a certain number of hours, and that the plaintiff's medical certifications never included any limitation on the number of hours he was able to work. Id. at ¶¶32,[1] 34. The plaintiff disputes this, asserting that in 2017, his medical certification indicated that he should not work over nine hours in a day. Id. at ¶32. The parties agree that the plaintiff was not disciplined for this incident (though the plaintiff says that it had a "chilling effect" on him). Id. at ¶36.

[1] The plaintiff's responses to the defendant's proposed findings of fact misnumber the defendant's proposed facts beginning with proposed fact 31. Because the court is citing to the plaintiff's responses, the court has preserved the plaintiff's numbering.

The plaintiff also asserts that on three different occasions he was required to work on the CAIS unit, which he said exacerbated his medical condition. Id. at ¶40. The plaintiff states that the CAIS unit was "more physically demanding" due to the needs of children. Dkt. No. 31 at 76, ¶28 (Plaintiff's Additional Facts). The defendant maintains that there was nothing in the plaintiff's medical certifications that prevented or restricted him from working in CAIS and asserts that he was able to complete his assigned shifts on the CAIS unit each time. Dkt. No. 26 at ¶¶41–42.

C. Extra Work Shifts

When extra shifts became available that needed to be worked, BHD typically posted those shifts on an online portal seventy-two hours in advance, which allowed nurses to sign up to voluntarily work the open shift. Id. at ¶43. If no nurses signed up to work the available shift, BHD would try to find someone to work the shift by offering to make some type of work swap and/or by offering a critical bonus or financial incentive to the nurse who was willing to work the open shift. Id. at ¶44. If there were still no nurses willing to work the open shift after all options had been exhausted, BHD had the ability to mandate or require that a nurse work the open shift. Id. at ¶¶45–46. The plaintiff concedes these facts but adds that nurses could refuse a mandate up to three times without discipline. Id. at ¶45.

The plaintiff asserts that he was denied the ability to take on extra shifts and that other employees who were not on FMLA had the ability to, and did, take on extra shifts during this time. Id. at ¶47. But the parties dispute

whether the plaintiff can identify any specific dates or times in which he was denied the opportunity to work an additional shift that he wanted to work. Id. at ¶¶52, 54. The plaintiff acknowledges that he generally did not sign up for available shifts in advance because he did not know if he would have a flare-up of his medical condition. Id. at ¶48.

There were times that BHD needed someone to cover an eight-hour shift, but the plaintiff was willing or able to work only four hours of the required eight-hour shift. Id. at ¶50. In such cases, the defendant says that BHD would provide the open shift to a nurse who was able to work the entire shift. Id. at ¶51. At times, the plaintiff was allowed to work a four-hour shift because no other nurses were available to work the full eight hours. Id. at ¶53.

D. April 23, 2018 Discipline

On April 20, 2018, Taft asked the plaintiff whether he was willing to work an open shift on the 43A unit the following day. Id. at ¶56. The plaintiff did not agree to work the offered shift because Taft could not guarantee that the plaintiff would not be rotated to a unit other than 43A, but the plaintiff told Taft that he would show up at the time of the shift change on April 21, 2018 to see if he was needed on 43A. Id. at ¶57. When the plaintiff showed up at shift change on April 21, 2018, someone informed him that he had been assigned to work in the CAIS unit. Id. at ¶58. The plaintiff did not work the shift and left the unit without talking to a supervisor or manager. Id. at ¶59.

On April 26, 2018, the defendant issued the plaintiff a First Warning for Performance because he did not work his scheduled shift. Id. at ¶60. The

plaintiff disputes that he was scheduled to work, asserting that he never officially accepted the offer to work that shift. Id. And the plaintiff argues that he was allowed to refuse up to three mandates before receiving written discipline. Id. The plaintiff did not receive any other discipline from the defendant in 2018. Id. at ¶62.

In the plaintiff's annual performance evaluation issued on or about February 11, 2019, Ellison rated the plaintiff as meets or exceeds expectations in all categories except "Accountability/Quality and Quantity" of work. Id. at ¶63. In the review, Ellison commented that the plaintiff's "need to use others as an example to prove that [he was] treated unfairly and that there was favoritism made in decisions made by the House Supervisors [he was] working with is a distraction that keeps [the plaintiff] from communicating effectively and professionally with others." Id. at ¶64.

E.    Internal Complaints/Grievances

On June 24, 2018, the plaintiff went to see Peter German, Human Resources partner for BHD, to complain about the April 2018 discipline because he felt that he was targeted and he did not feel that the discipline was substantiated. Id. at ¶66. The plaintiff could not recall whether he told German that he felt he was being targeted because of his membership in a protected class. Id. at ¶67. German informed the plaintiff that only the Director of Nursing, Linda Oczus, could remove the discipline from the plaintiff's file. Id. at ¶68.

The plaintiff made an appointment with Oczus in late June 2018 to discuss the discipline; when he met with Oczus, she told the plaintiff that she would investigate the matter. Id. at ¶69. On July 2, 2018, Oczus told the plaintiff that she had looked into the matter and that "there will be no change in the status of the action taken," but that she could discuss the matter further with HR and that they "would allow [the plaintiff] to write a rebuttal to the corrective action and include it in [his] file." Id. at ¶70. The plaintiff responded to Oczus that he wished he could resolve the matter internally, but that he would be looking for outside support. Id. at ¶71.

On November 26, 2018, the plaintiff emailed Ellison asking for an explanation as to why he didn't have the same opportunity to work extra shifts as others. Id. at ¶73. In his email, the plaintiff stated that since November 2, 2018 he had worked at least seven extra shifts. Id. at ¶74. The parties dispute whether Ellison gave the plaintiff a reason why he was not being given extra shifts. Id. at ¶¶75–76.

On December 9, 2019, the plaintiff emailed Oczus questioning various staffing decisions. Id. at ¶77. Oczus did not respond to this email. Id. at ¶78. On March 3, 2019, the plaintiff again emailed Taft, questioning various staffing decisions relating to picking up extra shifts. Id. at ¶79. Taft responded that "[t]he scheduling all depends on who is working a particular unit and the acuity of the unit. Usually, I don't like to pick someone up unless they can stay the entire shift . . . . With all that being said, I would love for you to pick up

more . . . . If you are looking to stay any night please let me know early enough too before I get other offers." Id. at ¶80.

On May 25, 2019, the plaintiff emailed Dr. Tony Thrasher, a member of the defendant's ethics committee, requesting a meeting. Id. at ¶81. The plaintiff had two meetings with Dr. Thrasher in which he expressed his concerns regarding several potential ethical issues, including: (1) a nurse who was related to a manager as a cousin, potentially creating a conflict of interest; (2) an incident in which a nurse provided him with the wrong medication amount for a patient; and (3) an incident in which he wanted to use a computer with a different font, which resulted in a verbal altercation with another nurse. Id. at ¶82. Dr. Thrasher explained to the plaintiff that the family relationship was a potential ethical issue that he would investigate further, but that the other two matters would need to be addressed with Human Resources. Id. at ¶83.

On June 18, 2019, the plaintiff emailed Lisa Ruiz in Human Resources, asking to set up a meeting sometime that week. Id. at ¶84. A few days later, the plaintiff had a conversation with Ruiz in which he raised several staffing issues. Id. at ¶85. The plaintiff could not recall raising discrimination as an issue during this meeting. Id. at ¶86. Ruiz suggested that the plaintiff discuss the matters directly with his supervisor. Id. at ¶87.

F. Applications for Other Positions

On January 17, 2017, the plaintiff applied for a position as a part-time Registered Nurse Clinician—Behavioral Emergency Services Mobile with the defendant. Id. at ¶90. The defendant received several applications for the

position and elected to pursue another candidate. Id. at ¶91. The position was at the same paygrade as the plaintiff's position as a Registered Nurse and the defendant considers them to be lateral or equivalent positions. Id. at ¶92. The plaintiff asserts that the position differed from his current position because it would have been full-time rather than part-time. Id. The defendant has no record of the plaintiff applying for any other positions. Id. at ¶94.

G. December 24, 2019 Incident

On December 24, 2019, while working on the 43A unit, a patient was banging his head against a wall and Nurse Latoya Walker asked the plaintiff for assistance in dealing with the patient. Id. at ¶95. The plaintiff stayed with the patient in his room while Walker called the psychiatric emergency unit (PCS) to speak with one of the doctors about administering an emergency injection. Id. at ¶96. When, after several minutes, Walker returned with the injection, there were four other individuals in the room with the patient—the plaintiff and three Psychiatric Technicians: Maurice Henderson, Olabisi Ajibade and Andejia Harris. Id. at ¶97.

As Walker started to administer the injection, the plaintiff picked up a rolled-up pair of socks that was lying on the patient's bed and moved the socks toward the patient's mouth. Id. at ¶99. The plaintiff testified that as the shot was administered, the patient's head "went into [plaintiff's] hand briefly." Id. at ¶100. The plaintiff states that the patient may have "briefly" bit the socks as Walker was administering the injection. Id. at ¶¶101–102. Walker stated that as she administered the shot to the patient, she observed the plaintiff placing the

socks in the patient's mouth. Id. at ¶103. As the plaintiff was holding the socks up by the patient's mouth, Ajibade slapped the plaintiff's hand away from the patient's mouth and said words to the effect, "don't do that" or "we don't do that here." Id. at ¶104. Ajibade testified that based on their training, it was inappropriate to ever place an object in front of the patient's face. Id. at ¶105.

H. Plaintiff's Termination

As a nurse employed by the BHD, the plaintiff was a classified employee, which meant that he could be removed from his position only by a vote of the Milwaukee County Civil Service Commission. Id. at ¶106. On January 10, 2020, Oczus filed formal disciplinary charges against the plaintiff, seeking to terminate his employment because of the December 24, 2019 incident. Id. at ¶108. The formal disciplinary charges alleged that the plaintiff's actions on December 24, 2019 violated various Civil Service Rules as well as BHD policies, including BHD's "Seclusion, Physical Restraint and/or Involuntary Medication: Emergent Use Policy." Id. at ¶110. BHD's policy states that any physician holds that could compromise a patient's airway are prohibited, including "[a]ny maneuver or technique that involves pushing on or into an individual's mouth, nose, or eyes, or covering the face with anything, including soft objects such as pillows or washcloths, or blankets, bedding etc." Id. at ¶111.

On March 5, 2020, an evidentiary hearing was held before a Hearing Examiner of the Milwaukee County Civil Service Commission, in which the plaintiff was represented by an attorney and all witnesses testified under oath and were subject to cross-examination. Id. at ¶112. On April 23, 2020, the Civil

Service Commission concluded that the plaintiff had violated BHD Policy and Civil Service Rules and that the charges were sufficient to sustain the plaintiff's termination. Id. at ¶113.

On July 22, 2020, the plaintiff filed a charge of discrimination with the EEOC, claiming that he "was not reasonably accommodated and that he was retaliated against and ultimately terminated because of his disability, gender, race and age (discrimination), because of his requests and use of accommodations, and because of his complaints of discrimination (retaliation)." Id. at ¶114.

I. Alleged Comparators

The plaintiff alleges that he was terminated for the December 24, 2019 incident despite other employees who had committed more serious or egregious acts not being terminated. Id. at ¶118. In general, the plaintiff asserts that nurses who received preferential treatment (such as getting extra shifts) were "either female, under forty, African American and/or not on FMLA." Dkt. No. 31 at 79, ¶32. The parties' proposed facts identify several possible comparators, but because neither party discusses those specific comparators in depth in their briefing, the court will not consider them here.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the

outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

## III. Motion for Summary Judgment (Dkt. No. 20)

The amended complaint raises seven claims: FMLA interference, FMLA retaliation, race discrimination under Title VII and 42 U.S.C. §1981, disability discrimination under the ADA, age discrimination under the ADEA, gender discrimination under Title VII and retaliation under Title VII, the ADA and the ADEA. Dkt. No. 12. As stated earlier, the defendant moved for summary judgment on all claims.

### A. FMLA Interference

The defendant argues that it never denied the plaintiff the opportunity to take FMLA leave or otherwise interfered with his right to do so. Dkt. No. 21 at 5. It asserts that the plaintiff took fourteen days of FMLA leave over the course of his employment, all of which were in full, eight-hour increments. Id. It contends that the plaintiff has presented no evidence that he attempted to leave work mid-shift for a flare-up or that he was required to find coverage for a shift to take FMLA leave. Id. It argues that in the one instance where the defendant asked him to stay for overtime, the plaintiff was allowed to refuse the overtime shift after informing his supervisor of his FMLA-covered condition. Id. at 6. The defendant asserts that the plaintiff never identified the specific date of this incident, so he has failed to show it falls within the two-year limitation period. Id. The defendant argues that the plaintiff supports his argument about this incident with hearsay statements from his physician, which cannot be considered on summary judgment. Id.

The defendant argues that there is no evidence that it "chilled" the plaintiff's rights under the FMLA or denied him the opportunity to pick up extra shifts. Id. at 7. The defendant points out that the plaintiff chose not to sign up for extra shifts in advance and that the plaintiff could not recall any specific dates on which he was able to work an extra shift and was denied the opportunity to do so. Id. at 7–8. The defendant argues that the plaintiff's rotations to the CAIS unit did not interfere with his FMLA rights because all nurses were required to rotate on occasion, and the plaintiff was able to complete his assigned shifts without incident. Id. at 8–9. The defendant contends that the undisputed facts show the plaintiff was on approved intermittent FMLA leave from April 2017 to the end of his employment and that he was able to take FMLA leave whenever he needed. Id. at 9.

The plaintiff's response brief addresses both of his FMLA claims and his ADA claim in the same section, so it is difficult for the court to determine which of his responses relate to which of the defendant's specific arguments. See Dkt. No. 29 at 5–9. Primarily the plaintiff responds to the defendant's FMLA interference arguments by asserting that he should have been able to use his FMLA leave whenever his condition flared up, including mid-shift. Id. at 7. The plaintiff asserts that the defendant denied him the opportunity to take FMLA mid-shift and threatened him with discipline when he attempted to leave for a flare-up during a shift. Id. He argues that he was disciplined in April 2018 for declining to work an extra shift on the CAIS unit despite never formally

accepting the shift. Id. He also argues that the defendant "actively prevent[ed]" him from taking on extra shifts. Id. at 8.

The defendant replies that there is no evidence in the record showing that it refused to allow the plaintiff to leave mid-shift for FMLA purposes. Dkt. No. 30 at 7–8. As for the April 2018 incident, the defendant argues that there was nothing in the plaintiff's medical certification that restricted him from working on the CAIS unit and that he never informed anyone that he could not work on that unit due to his FMLA-covered condition. Id. at 8–9.

An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. §2615(a)(1). To establish an FMLA interference claim, the plaintiff must show that "(i) he was eligible for FMLA protections; (ii) the [defendant] was covered by the FMLA; (iii) he was entitled to leave under the FMLA; (iv) he provided sufficient notice of his intent to take leave; and (v) the [defendant] interfered with, restrained, or denied FMLA benefits to which he was entitled." Ziccarelli v. Dart, 35 F.4th 1079, 1089 (7th Cir. 2022) (citing 29 U.S.C. §2615(a)(1); Preddie v. Bartholomew Consol. School Corp., 799 F.3d 806, 816 (7th Cir. 2015)). Only the last element is at issue here.

But before the court reaches the merits of the plaintiff's interference claim, it must consider whether the claim is timely. A plaintiff must bring an FMLA claim "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. §2617(c)(1); Barrett v. Ill. Dep't of Corr., 803 F.3d 893, 898 (7th Cir. 2015) (affirming

summary judgment for employer based on FMLA statute of limitations). The limitation period is extended to three years if the employer acted willfully. 29 U.S.C. §2617(c)(2). The limitation period begins to run from the "last event constituting the alleged violation." 29 U.S.C. §2617(c)(1). The plaintiff filed his complaint on August 12, 2020, meaning that any violations that occurred prior to August 12, 2018 (or prior to August 12, 2017, if the plaintiff can show the violation was willful) would be untimely.

In his response brief, the plaintiff did not address the defendant's statute of limitation argument. The record evidence shows, however, that the plaintiff has not identified specific dates of the activities that allegedly constituted interference. The one specific example upon which the plaintiff relies is that—as he testified at his deposition—in "2017 or 2018," he told Taft that he was unable to work overtime because of his FMLA-covered condition. Dkt. No. 27-1 at 20 (Tr. pp. 76:2–77:8). When the plaintiff spoke to Ellison about the incident, Ellison said that the plaintiff was not able to take intermittent leave under the FMLA and that he may be disciplined for refusing to work overtime. Id. at 20–21 (Tr. pp. 77:9–78:18). When asked at the deposition whether he could provide a specific date, the plaintiff stated that he "would simply be guessing" when the incident occurred. Id. at 20 (Tr. p. 76:16–20).

Although the statute of limitations is an affirmative defense, the defendant may establish the defense by pointing to the absence of evidence in the record to support the plaintiff's timeliness. See Celotex, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is,

pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). There is no evidence in the record show that the alleged interference happened after August 12, 2018, so the defendant has met its burden to show an absence of evidence to support the plaintiff's case on this element. The plaintiff's failure to rebut the defendant's showing—and his apparent inability to do so based on his deposition testimony—means that summary judgment for the defendant is proper.

The plaintiff cannot save his claim by invoking the three-year limitation period for willful FMLA violations. "To benefit from the three-year statute of limitations in §2617(c)(2), a plaintiff must show that [his] employer either knew the FMLA prohibited its conduct or showed reckless disregard for whether it did." Sampra v. United States Dep't of Transp., 888 F.3d 330, 334 (7th Cir. 2018) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)). The plaintiff never argued this, nor do the undisputed facts show willfulness. At most, the plaintiff's testimony shows that Ellison misunderstood what form of FMLA the plaintiff had—intermittent versus long-term FMLA. The plaintiff presented no facts to suggest that Ellison knowingly or recklessly disregarded the plaintiff's rights by telling the plaintiff that he did not think the plaintiff could take intermittent FMLA. The plaintiff cannot take advantage of the three-year statute of limitations. See id. (affirming summary judgment in favor of defendants where plaintiff "failed to offer evidence sufficient to rely on the three-year limitation for willful violations" and so the two-year statute of limitations barred her claim).

Because the plaintiff's FMLA interference claim is untimely, the court need not reach the merits of the claim. The court will grant summary judgment for the defendant on Count I of the amended complaint.

B. FMLA Retaliation

The defendant argues that the plaintiff's FMLA retaliation claim cannot survive because there is no causal connection between his FMLA usage and any adverse employment action. Dkt. No. 21 at 9–10. First, the defendant argues that it cannot be liable for failing to hire the plaintiff for a lateral position in January 2017 because the plaintiff did not begin taking FMLA leave until April 2017. Id. at 11. The defendant also argues that the January 2017 failure-to-hire is outside of the applicable statute of limitation. Id. Next, the defendant argues that the plaintiff's April 2018 discipline and the comments on his February 2019 performance evaluation were not adverse employment actions as a matter of law and that they had no connection to his FMLA usage. Id. at 12–13. Last, the defendant argues that it terminated the plaintiff because of the December 2019 incident where he placed socks in a patient's mouth. Id. at 13. It argues that his termination was upheld by the Civil Service Commission, the members of which were not aware of the plaintiff's FMLA usage. Id. at 14.

The plaintiff argues that the defendant used the December 2019 incident as a pretext to terminate him in retaliation for using FMLA leave. Dkt. No. 20 at 12–13. He argues that the defendant deviated from standard policy by performing an incomplete investigation into the incident and by not disciplining

any of the other employees involved in the incident. Id. at 13. He asserts the "cat's paw" theory of liability, arguing that the Civil Service Commission was persuaded to affirm his termination because of his supervisor's discriminatory bias. Id. The plaintiff does not argue that any of the other disciplinary actions mentioned by the defendant in its brief were materially adverse actions.

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the Act. 29 U.S.C. §2615(a)(2). An FMLA retaliation claim "requires proof of discriminatory or retaliatory intent while [an interference claim] requires only proof that the employer denied the employee his or her entitlements under the Act." Kauffman v. Fed. Exp. Corp., 426 F.3d 880, 884 (7th Cir. 2005). The plaintiff must show that (1) he engaged in a protected activity; (2) the defendant took an adverse employment action against him; and (3) there is a causal connection between his protected activity and the adverse employment action. Cracco v. Vitran Express, Inc., 559 F.3d 625, 633 (7th Cir. 2009) (citing Andonissamy v. Hewlett–Packard Co., 547 F.3d 841, 850 (7th Cir. 2008)). The plaintiff can show retaliatory intent through (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which a retaliatory intent might be drawn," (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently," or (3) "evidence that the employer offered a pretextual reason for an adverse employment action." Perez v. Thorntons, Inc., 731 F.3d 699, 711 (7th Cir. 2013).

The plaintiff engaged in protected activity by taking FMLA leave, and termination is an adverse employment action, James v. Hyatt Regency Chi., 707 F.3d 775, 782 (7th Cir. 2013), so causation is the only issue in dispute.[2] There is no record evidence that the plaintiff's FMLA leave was a substantial or motivating factor in the defendant's decision to terminate him. The plaintiff does not dispute that he placed socks in or near a patient's mouth while trying to restrain him. Dkt. No. 26 at ¶¶101–02. He testified in his deposition that the patient "may have bit the sock briefly." Dkt. No. 27-1 at 65 (Tr. p. 254:16–17). The defendant determined that these actions constituted a violation of BHD policy and the Civil Service Commission affirmed that decision after an evidentiary hearing. The plaintiff attacks the investigation into this incident, claiming that it was motivated by the defendant's discriminatory animus, but the undisputed facts are that the plaintiff indeed committed a policy violation. A policy violation is a legitimate, non-discriminatory reason for terminating an employee. See Guzman v. Brown County, 884 F.3d 633, 640–41 (7th Cir. 2018) (no claim for FMLA retaliation where employee was disciplined for policy violations); Cracco v. Vitran Exp., Inc., 559 F.3d 625, 634 (7th Cir. 2009) (no evidence of discriminatory intent where employee was terminated for performance issues uncovered while on FMLA leave).

The plaintiff did not identify any similarly situated employee (or employees) who committed similar policy violations and were not terminated.

[2] In his response brief, the plaintiff did not argue that any other actions by the defendant were adverse actions or formed the basis of his FMLA retaliation claim. See Dkt. No. 29 at 12.

Comparator employees must be comparable in "all material respects." Guzman, 884 F.3d at 640. "In determining whether two employees are directly comparable in all material respects, [courts] consider whether the employees held the same job description, were subject to the same standards, were subordinate to the same supervisor, and were similarly qualified." Id. The plaintiff provides none of this information for any other employees he mentions, so the court cannot determine whether they were similarly situated to the plaintiff. And although the plaintiff argues that the other employees involved in the December 2019 incident also should have been disciplined, there is no evidence that the other employees participated in putting the socks into the patient's mouth. In fact, one of the employees present at the time told the plaintiff to move the socks *away* from the patient. Dkt. No. 26 at ¶104. The plaintiff also claims that the defendant "circumvented" policy when terminating him, but he does not explain how.

Because the plaintiff has presented no evidence that the defendant terminated him because of his FMLA leave, the court will grant summary judgment for the defendant on Count II of the amended complaint.

C. Race Discrimination

The defendant argues that the plaintiff cannot establish a claim of race discrimination. Dkt. No. 21 at 15. It asserts that because the plaintiff is White, he must show that additional "background circumstances" exist to support an inference that it discriminated against him, and it says that the plaintiff has failed to present any evidence of such additional circumstances. Id. at 16. The

defendant argues that the plaintiff was not meeting its legitimate expectations because of his treatment of a patient during the December 2019 incident. Id. at 16–17. It contends that none of the plaintiff's alleged negative treatment—other than his termination—rises to the level of an adverse action under the law. Id. at 17–18. The defendant argues that there is no evidence that a similarly situated non-White employee was treated more favorably after committing similar policy violations as the plaintiff. Id. at 18–19.

The plaintiff makes a combined argument for his race, gender and age discrimination claims. Dkt. No. 29 at 9–10. He argues that other nurses were selected to work extra shifts over him and those nurses "were all either female, black/African-American, and/or under the age of forty, and none of them had used FMLA." Id. at 9. He argues that he was the only White male over the age of forty present during the December 2019 incident and that he was the only one disciplined, which he argues suggests discrimination. Id. at 10. He argues that the other employees should have been disciplined for their failure to report the incident. Id.

The defendant replies that the plaintiff is unable to identify any specific times he wanted to work extra shifts but was denied the opportunity. Dkt. No. 30 at 9–10. The defendant argues that the record contains no evidence regarding the race of the other individuals in the room during the December 2019 incident, so as a matter of law the plaintiff cannot establish discriminatory treatment in comparison to those individuals. Id. at 10. The defendant asserts that the plaintiff misrepresents the facts, because a nurse

who failed to immediately report the incident *was* disciplined for her failure to report. Id. at 11.

The plaintiff, who is White, asserts that he was treated less favorably than his African-American coworkers. In these types of "reverse discrimination" cases, the Seventh Circuit has modified the traditional Title VII race discrimination analysis to require evidence of "background circumstances" that demonstrate that "the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." Dunlevy v. Langfelder, 52 F.4th 349, 353 (7th Cir. 2022) (quoting Bless v. Cook Cnty. Sheriff's Office, 9 F.4th 565, 574 (7th Cir. 2021)). The same "reverse discrimination" "principles apply in the context of a § 1981 action." Hague v. Thompson Distrib. Co., 436 F.3d 816, 821–22 (7th Cir. 2006) (citing Bennett v. Roberts, 295 F.3d 687, 697 (7th Cir. 2002)); see also Morris v. BNSF Ry. Co., 969 F.3d 753, 758 (7th Cir. 2020) (explaining that Title VII and Section 1981 claims have the same liability standards).

Plaintiffs in "reverse discrimination" cases must show:

> (1) "background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand"; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class.

Formella v. Brennan, 817 F.3d 503, 511 (7th Cir. 2016) (quoting Ballance v. City of Springfield, 424 F.3d 614, 617 (7th Cir. 2005)). As in the original

McDonnell Douglas[3] framework, if the plaintiff "establishes the *prima facie* case, then the burden shifts to the defendants to offer a 'legitimate, non-discriminatory reason for the [adverse employment] decision.'" Bless, 9 F.4th at 574 (alteration in original) (quoting Formella, 817 F.3d at 511). "And if the defendants make that showing, the burden shifts back to [the plaintiff] to demonstrate that the reason is pretext for race discrimination." Id.

The defendant argues that the plaintiff failed to present sufficient "background circumstances" supporting his claim. Admittedly, "[t]he contours of what constitutes a background circumstance are not precise." Mills, 171 F.3d at 455. The Seventh Circuit has "suggested that '[a] gross disparity in qualifications might be such evidence'" in a failure-to-hire case. Bless, 9 F.4th at 574 (quoting Preston v. Wis. Health Fund, 397 F.3d 539, 542 (7th Cir. 2005)). Other courts have "held that background circumstances could include situations in which: the person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed intense interest in hiring a woman, and there was a pattern of hiring women in the past," or have found "the plaintiff successfully showed background circumstances where she was the only white employee in the department and nearly all of the decision makers were Hispanic." Mills, 171 F.3d at 455. But the plaintiff here did not present any argument on this element. His brief relies solely on generalized assertions that nurses "either female, black/African-American, and/or under the age of forty" were treated more favorably than he was. This is not enough to establish

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

the necessary background circumstances for a reverse discrimination claim, nor is it enough to establish a *prima facie* case of discrimination in a typical case because the plaintiff has not identified any specific, non-White comparators who were treated more favorably than he was. His generalized allegations are not enough.

Nor has the plaintiff established that he was meeting the defendant's legitimate expectations at the time of his termination. As discussed above, the undisputed facts show that the plaintiff committed a policy violation that the Civil Service Commission determined justified his termination. The plaintiff has presented no evidence that this reasoning was pretextual.

Because the plaintiff cannot establish a *prima facie* case of race discrimination or that the defendant's reason for terminating him was pretextual, the court will grant summary judgment for the defendant on Count III of the amended complaint.

D. Disability Discrimination

The defendant argues that the plaintiff has failed to establish a disability discrimination claim. Dkt. No. 21 at 20. Oddly, the defendant begins by arguing that the plaintiff did not have a disability covered by the ADA, but in its statement of facts, the defendant concedes that for the purposes of summary judgment, the plaintiff had a disability covered by the ADA. Dkt. No. 26 at ¶10. The defendant has waived its arguments about the plaintiff's disability status. The defendant next argues that the plaintiff was not meeting its legitimate expectations due to his policy violation on December 24, 2019.

Dkt. No. 21 at 21. It argues that the plaintiff was not terminated due to his disability but because of his conduct in placing socks near a patient's mouth. Id. at 23. The defendant asserts that decision-makers did not know that the plaintiff had a disability, only that he was on approved FMLA leave, further weakening any inference of causation. Id. at 22–23. The defendant argues that to the extent the plaintiff makes a failure to accommodate claim, that claim must fail because the plaintiff never requested an accommodation for his disability. Id. at 23.

The plaintiff analyzes his ADA claim and his FMLA claims together, again making it difficult for the court to determine which of his arguments relate to which of the defendant's arguments or to which of the claims. He argues that non-disabled nurses were allowed to work extra four-hour shifts while he was not. Dkt. No. 29 at 8. He asserts that the defendant does not take complaints of discrimination seriously and does not appropriately investigate them. Id. He states that it was not necessary for him to make a formal request for accommodation because the defendant refused to acknowledge a "potential disability" and instead forced the plaintiff to find his own replacement when he needed to leave mid-shift, work on a unit that exacerbated his condition or stay until rush hour traffic began which also would exacerbate his condition on his commute home. Id. at 9.

The plaintiff has not established a claim for either disability discrimination or failure to accommodate under the ADA. "A disability discrimination claim under the ADA requires proof that: (1) the plaintiff was

disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the "but for" cause of the adverse employment action." Castetter v. Dolgencorp, LLC, 953 F.3d 994, 996 (7th Cir. 2020) (citing Scheidler v. Indiana, 914 F.3d 535, 541 (7th Cir. 2019)). The plaintiff's claim fails on causation just as his race discrimination claim did. The plaintiff cannot show that he was terminated because of his disability. The undisputed facts show that the plaintiff committed a policy violation and that the defendant terminated him for that violation. There is no evidence that even if the defendant were aware of the plaintiff's alleged disability, that knowledge played any role in the decision to terminate him.

To establish a *prima facie* case for failure to accommodate under the ADA, "a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability." Kotwica v. Rose Packing Co., 637 F.3d 744, 747–48 (7th Cir. 2011). Additionally, "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." Jovanovic v. In-Sink-Erator, 201 F.3d 894, 899 (7th Cir. 2000). It's unclear from the record what accommodation the plaintiff requested or if he initiated the interactive process with the defendant to discuss reasonable accommodations. The plaintiff's deposition testimony reflects that he discussed his foot condition and its associated needs in the context of the FMLA, not the ADA. But the fact that the plaintiff had an FMLA-covered medical condition

does not satisfy the ADA's disability standard. "'[D]isability' under the ADA and 'serious health condition' under the FMLA are distinct concepts that require different analyses." Burnett v. LFW Inc., 472 F.3d 471, 483 (7th Cir. 2006) (quoting Rhoads v. F.D.I.C., 257 F.3d 373, 387 n.12 (4th Cir. 2001)). The plaintiff's notice to his employer that he had an FMLA-covered condition does not automatically provide notice of an ADA-covered condition. The plaintiff has failed to present evidence that the defendant was aware of his disability or that he sought a reasonable accommodation that the defendant denied.

Because the plaintiff has not established that the defendant discriminated against him because of his disability or failed to accommodate him, the court will grant summary judgment for the defendant on Count IV of the amended complaint.

E.    Age Discrimination

The defendant argues that the plaintiff has failed to establish an age discrimination claim for the same reasons he failed to establish a race discrimination claim. Dkt. No. 21 at 24–25. The defendant reiterates that the plaintiff was not meeting its legitimate performance expectations based on the policy violations he committed on December 24, 2019. Id. at 25. The defendant also contends that the plaintiff has failed to identify a similarly situated employee younger than forty who was treated more favorably than he was. Id.

As mentioned above, the plaintiff makes a combined argument for his race, gender and age discrimination claims. Dkt. No. 29 at 9–10. He also briefly

asserts that he was prevented from using a computer with a larger font, which he argues was discriminatory. Id. at 9.

To establish a claim for age discrimination under ADEA, the plaintiff must "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Skiba v. Ill. Cent. R.R. Co., 884 F.3d 708, 719 (7th Cir. 2018) (quoting Carson v. Lake County., Ind., 865 F.3d 526, 532 (7th Cir. 2017)). "In other words, 'in the ADEA context, it is not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred.'" Id. (quoting Martino v. MCI Commc'ns Serv., Inc., 574 F.3d 447, 455 (7th Cir. 2009)). The plaintiff has failed to meet this burden. The undisputed facts show that the plaintiff committed a policy violation and was terminated based on that violation. There is no evidence to suggest that but for the plaintiff's age, he would not have been terminated.

The plaintiff's assertion that he was denied the use of a computer with a larger font cannot serve as the basis for an age discrimination claim under the ADEA because it is not an adverse action. The Seventh Circuit has held that similar conduct is not an adverse action without evidence that the denial of equipment had any significant job consequences. See Markel v. Bd. of Regents of Univ. of Wis. Sys., 276 F.3d 906, 911 (7th Cir. 2002) (holding denial of "better" equipment does not constitute an adverse employment action); Place v. Abbott Lab'ys, 215 F.3d 803, 810 (7th Cir. 2000) (concluding that loss of a

telephone and cubicle are "too trivial to amount to an adverse employment action").

Because the plaintiff has failed to establish an age discrimination claim, the court will grant summary judgment for the defendant on Count V of the amended complaint.

F. Gender Discrimination

The defendant argues that the plaintiff's gender discrimination claim must fail for the same reasons as his race, age and disability discrimination claims. Dkt. No. 21 at 25. The defendant repeats that the plaintiff was not meeting its performance expectations because of the December 2019 incident, and that the plaintiff failed to identify a similarly situated female employee who was treated more favorably than him. Id. at 26–27.

Again, the plaintiff made a combined argument for his race, gender and age discrimination claims. Dkt. No. 29 at 9–10. He also asserts briefly that he was told that male nurses must take more difficult patients. Id. at 9. For the reasons that the court has discussed with regard to his other claims, the plaintiff has not provided evidence of gender discrimination. He has not identified female employees who were similarly situated and who were treated differently. He has presented no evidence that his gender was the but-for cause of his termination or any of the other employment actions he has alleged. The court will grant summary judgment for the defendant on Count VI of the amended complaint.

G. Retaliation

Finally, the defendant argues that the plaintiff cannot establish a retaliation claim because there is no causal connection between his protected activity and his termination. Dkt. No. 21 at 28. The defendant contends that the plaintiff never filed an internal complaint of discrimination or otherwise raised a claim that he was being treated differently based on his membership in a protected class. Id. at 29. It argues that the plaintiff's complaints about being treated "unfairly" were too vague and generic to support a retaliation claim. Id. The defendant again maintains that the plaintiff was terminated for the December 2019 policy violation and not for any protected activity or any other discriminatory reason. Id.

Although Count VII of the amended complaint brings a retaliation claim under Title VII, ADEA and the ADA, the plaintiff mentions only the ADA claim in his response brief and argues only that his termination was the retaliatory action. Dkt. No. 29 at 11–12. He attempts to support his retaliation claim with the same arguments and evidence he presented for his FMLA retaliation claim. Id.

The Seventh Circuit uses the same framework to analyze retaliation claims under the FMLA and the ADA. Ziccarelli, 35 F.4th at 1091 (citing Freelain v. Village of Oak Park, 888 F.3d 895, 900–01 (7th Cir. 2018)). As the court has discussed in its analysis of the plaintiff's FMLA retaliation claim, there is no evidence that the defendant discharged the plaintiff for discriminatory or retaliatory reasons. The undisputed facts show that the

defendant terminated the plaintiff for committing the policy violation. The court will grant summary judgment for the defendant on Count VII of the amended complaint.

Because the court is granting summary judgment for the defendant on all claims, the court will dismiss this case with prejudice.

## IV. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 20.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 7th day of November, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**